AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original    ☐ Duplicate Original

**LODGED**
CLERK, U.S. DISTRICT COURT

**7/14/2025**

CENTRAL DISTRICT OF CALIFORNIA
BY: ___MMC___ DEPUTY

**FILED**
CLERK, U.S. DISTRICT COURT

**07/14/2025**

CENTRAL DISTRICT OF CALIFORNIA
BY: ____IV____ DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

United States of America

v.

GERARDO LUCERO,

Defendant.

Case No.    2:25-MJ-04314-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the dates of November 12, 2024, November 20, 2024, December 2, 2024, and January 16, 2025, in the county of Los Angeles in the Central District of California, the defendant violated:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii) | Distribution of 50 or More Grams of Methamphetamine |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____/s/_____
*Complainant's signature*

Hugo Pang, ATF Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    July 14, 2025

*Patricia Donahue*
*Judge's signature*

City and state:    Los Angeles, California

Hon. Patricia Donahue, U.S. Magistrate Judge
*Printed name and title*

AUSA:  Matthew Tang (x0470)

## AFFIDAVIT

I, Hugo Pang, being duly sworn, declare and state as follows:

### I.  PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal complaint and arrest warrant against Gerardo LUCERO ("LUCERO") for violations of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii) (Distribution of 50 or More Grams of Methamphetamine).

2.    This affidavit is also made in support of applications for warrants to search:

a.    a mechanic shop located at 4410 South Kansas Avenue, Los Angeles, California 90037 (the "SUBJECT BUSINESS"), believed to be LUCERO's place of employment, as described more fully in Attachment A-1;

b.    a gray 2018 Nissan Sentra bearing California license plate 8FIC201 ("SUBJECT VEHICLE 1"), believed to be used by LUCERO, as described more fully in Attachment A-2;

c.    a gray Chevrolet Durango bearing California license plate 9KNS691 ("SUBJECT VEHICLE 2"), believed to be used by LUCERO, as described more fully in Attachment A-3; and

d.    the person of LUCERO, as described more fully in Attachment A-4.

3.    The requested search warrants seek authorization to seize the evidence, fruits, and instrumentalities of violations of 21 U.S.C. § 841(a)(1) (Distribution of a Controlled Substance) and 18 U.S.C § 922(a)(1)(A) (Engaging in the Business of Dealing in Firearms Without a License) (the "Subject

Offenses"), as described more fully in Attachment B.
Attachments A-1, A-2, A-3, A-4, and B are incorporated herein by
reference.

4.   The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested complaint, arrest
warrant, and search warrants, and does not purport to set forth
all of my knowledge of or investigation into this matter.
Unless specifically indicated otherwise, all conversations and
statements described in this affidavit are related in substance
and in part only, and all dates and times listed are on or about
those indicated.

## II. <u>INTRODUCTION</u>

1.   I am a sworn Special Agent with the United States
Department of Justice, Bureau of Alcohol, Tobacco, Firearms and
Explosives ("ATF"), and have been so employed since December
2023.  I am a graduate of the Federal Law Enforcement Training
Center ("FLETC") in Glynco, Georgia and have completed
specialized training at the ATF National Academy's Special Agent
Basic Training course.  I have received training in federal
firearms and narcotics laws, narcotics identification,
confidential source handling, and various surveillance and
investigative techniques.  I am currently assigned to the ATF
Los Angeles Field Division in Los Angeles, California.

2.    Prior to becoming an ATF Special Agent, I was employed with the Los Angeles Police Department ("LAPD") for approximately eight years.  During my tenure at the LAPD, I was a patrol officer at the Central, Hollywood and Rampart Divisions.  I conducted numerous firearms, narcotics, gang and violent crime investigations and arrests.  As part of my tenure as an LAPD officer, I also became familiar with the illicit way firearms and controlled substances are acquired, distributed, and sold.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

3.    Between November 2024 and March 2025, a confidential source ("CS") and undercover ATF Special Agents ("UCs") purchased approximately 5,525 grams of pure methamphetamine, approximately 269 grams of fentanyl, four firearms, and several rounds of ammunition from LUCERO over the course of six separate transactions.

4.    **SUBJECT BUSINESS:** On at least two occasions in January 2025 and March 2025, LUCERO sold firearms to UCs at the SUBJECT BUSINESS, a mechanic shop.  From December 4, 2024 to the present, location data obtained from a phone subscribed to LUCERO pursuant to a federal search warrant showed the phone frequently at the SUBJECT BUSINESS.

5.    During this investigation, LUCERO used SUBJECT VEHICLE 1 and SUBJECT VEHICLE 2 to transport methamphetamine and fentanyl from the SUBJECT BUSINESS, which were later sold to the UCs.

a.    **SUBJECT VEHICLE 1:** On November 12, 2024, and on

December 2, 2024, LUCERO transported methamphetamine in SUBJECT VEHICLE 1[1].

      b.  **SUBJECT VEHICLE 2:** On November 20, 2024 and January 16, 2025, LUCERO transported methamphetamine and fentanyl in SUBJECT VEHICLE 2[2].

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

### A.   **Investigative Background into LUCERO's Trafficking**

6.   Based on my review of text messages, my own knowledge of the investigation, my review of law enforcement reports, and my conversations with the CS and other law enforcement officers, I am aware of the following:

7.   In or around September 2024, the CS[3] informed me about an individual later identified as LUCERO,[4] who the CS believed could arrange narcotics and firearms sales in the Los Angeles

---

[1] SUBJECT VEHICLE 1 is registered to Madera Cecillia Rodriguez with the address of 2324 Myrtle Avenue in Long Beach, CA.  The address is shared by Katherine Navarette, who is listed as a smog inspector for the SUBJECT BUSINESS, by the California Bureau of Automotive Repair.

[2] SUBJECT VEHICLE 2 is registered to Emilio Lucero with the address of 1633 6th Avenue in Los Angeles, CA.  According to a query of commercial databases, Emilio Lucero is LUCERO's father.

[3] The CS has provided information to ATF since 2024. The CS has two felony convictions. The CS has also been arrested for unlicensed sale of a firearm, in violation of California Penal Code 27545, and for prohibited person in possession of ammunition, in violation of California Penal Code 30305(a)(1). Evidently, the CS's motivation for providing information is for prosecutorial leniency.  The CS has participated in a controlled purchase of suspected narcotics as part of an ATF investigation. The CS has not, to my knowledge, provided information to me that was later deemed inaccurate or misleading.  For these reasons, I believe the CS's information to be reliable.

[4] LUCERO was later identified via his California Department of Motor Vehicles ("CA DMV") image record.

area.  The CS knew LUCERO from prior contacts in the Los Angeles area.

8.    In or around early September 2024, the CS exchanged text messages with a telephone number subscribed to LUCERO at 1633 6th Avenue, Los Angeles CA, 90019[5] (the "Subject Telephone").  In several of these text messages, LUCERO told the CS that he was able to broker the sale of unserialized privately manufactured firearms (commonly referred to as "ghost guns").  LUCERO also sent the CS a photograph of an AR-style rifle.  Finally, LUCERO stated that he sold methamphetamine by the pound.

**B.    On November 12, 2024, LUCERO Sold Approximately 422 Grams of Methamphetamine to a UC (Controlled Purchase #1)**

9.    Based on my review of text messages, recorded surveillance footage, and my conversations with the CS and other law enforcement officers, I am aware of the following:

10.    In November 2024, the CS texted the Subject Telephone and inquired about the purchase of methamphetamine.  LUCERO agreed to sell methamphetamine, and suggested they meet "at the market"[6] (the "Meeting Location").

---

[5] SUBJECT VEHICLE 2 is also registered to this address under the name Emilio Lucero, _i.e._, LUCERO's father.

[6] Based on conversations with the CS, I understand "the market" to refer to "Superior Market" located at 4373 South Vermont Avenue in Los Angeles, CA.

11.  Over the next several days, the CS and LUCERO discussed potential meeting times, eventually settling on November 12, 2024.

12.  On November 12, 2024, the CS, accompanied by an ATF undercover agent ("UC-1") posing as a firearms and narcotics trafficker, met LUCERO at the Meeting Location.  LUCERO arrived at the Meeting Location driving SUBJECT VEHICLE 1.

13.  LUCERO gave the CS and UC-1 a black plastic bag containing a clear sealed bag of what appeared to be methamphetamine.  In return, UC-1 gave LUCERO $750 in cash.

14.  After the transaction, an ATF surveillance team saw LUCERO drive approximately two blocks away to the SUBJECT BUSINESS.

15.  The suspected drugs were sent to a DEA laboratory for testing.  The DEA laboratory determined the drugs consisted of approximately 422 grams of pure methamphetamine.

16.  Following the meeting, UC-1 reviewed LUCERO's California Department of Motor Vehicle ("DMV") image record and identified LUCERO as the individual who had provided the methamphetamine.  An ATF surveillance team outside the SUBJECT BUSINESS also confirmed that they saw LUCERO returning to the SUBJECT BUSINESS after the drug transaction.

**C.    On November 20, 2024, LUCERO Sold Approximately 1,626 Grams of Methamphetamine and Approximately 269 Grams of Fentanyl to a UC (Controlled Purchase #2)**

17.    Based on my review of text messages, recorded surveillance footage, and my conversations with the CS and other law enforcement officers, I am aware of the following:

18.    In November 2024, the CS texted the Subject Telephone and inquired about the purchase of methamphetamine and firearms.

19.    The CS and LUCERO tentatively agreed to meet on November 20, 2024, for the transaction.

20.    On November 20, 2024, an ATF surveillance team saw LUCERO enter SUBJECT VEHICLE 2 and drive SUBJECT VEHICLE 2 towards the Meeting Location.

21.    LUCERO later arrived at the Meeting Location in SUBJECT VEHICLE 2. He gave UC-1 a white plastic bag containing four clear sealed bags of what appeared to be methamphetamine. In return, UC-1 gave LUCERO $3,000 in cash.

22.    The CS told LUCERO that he/she was "trying to get some gats, some cuetes."[7]  LUCERO responded, "For sure, I have to look, give me today or tomorrow."  LUCERO asked the CS if the CS wanted pictures of the firearms.  The CS affirmed.

23.    UC-1 told LUCERO that he intended to send the methamphetamine to Chicago, IL.  LUCERO responded that he had a customer based in Chicago, IL.

---

[7] Based on conversations I had with the CS, I understand "gats" and "cuetes" to be slang terminology for firearms.

24.    LUCERO asked UC-1 if UC-1 knew anyone that was interested in "pastillas," or pills.  UC-1 asked how much LUCERO was selling the pills for.  LUCERO responded, "$500 a boat, they come in a thousand."  The CS asked LUCERO if the pills were "M30s", and LUCERO affirmed.  LUCERO stated he had three "boats" and asked if UC-1 wanted all three "boats" for $1,500.  UC-1 agreed and LUCERO stated that he would return in approximately three minutes.

25.    LUCERO departed the Meeting Location in SUBJECT VEHICLE 2.

26.    Approximately two minutes later, an ATF surveillance team observed LUCERO arriving at the SUBJECT BUSINESS.  LUCERO entered the SUBJECT BUSINESS, and quickly returned to SUBJECT VEHICLE 2 before driving towards the Meeting Location.

27.    Approximately two minutes after that, LUCERO arrived at the Meeting Location in SUBJECT VEHICLE 2 and handed a white plastic bag containing a clear plastic bag containing suspected fentanyl pills to UC-1.

28.    UC-1 asked LUCERO how many pills were in the bag and LUCERO responded, "3,000."  Referring to the pills, LUCERO stated, "I know in Chicago, they, they buy that a lot."

29.    UC-1 stated he/she did not know LUCERO also sold fentanyl pills.  LUCERO stated someone owed him money and paid him with the pills.  UC-1 asked if $1,500 was the best price LUCERO could offer for the pills.  LUCERO asked UC-1 to give him "13," or $1,300.  UC-1 agreed and paid LUCERO $1,300 for the approximately 3,000 fentanyl pills.

30.   UC-1 told LUCERO that he/she would take any firearms LUCERO had available and told LUCERO to send pictures of the firearms to the CS.  UC-1 then asked if the firearms were "legit" Glocks or "ghosts."  LUCERO stated that they were "the ghosters."

31.   Still in reference to the firearms, LUCERO stated, "Let me get them.  Once I have them, all of them in my hand, I'll tell you ay pull up to my shop[8] or something and then you could you see them right there in person."  UC-1 asked how many LUCERO had.  LUCERO stated, "I don't know. It's cause I have some with my brother in law.  It's cause I don't like to keep shit with me.  When I'm doing this, I don't wanna be mixing shit like that. You know, I like to like put that shit aside."[9]

32.   Soon after LUCERO departed the Meeting Location in SUBJECT VEHICLE 2, LUCERO texted the CS from the Subject Telephone, "Good looks compa, ill break you off with some bread."[10]  The CS declined.  The CS asked LUCERO to update him concerning the firearms.  LUCERO agreed.

33.   Minutes later, an ATF surveillance team saw LUCERO return to the SUBJECT BUSINESS in SUBJECT VEHICLE 2. The suspected drugs were sent to a DEA laboratory for testing.

---

[8] I understand the "shop" as referring to the SUBJECT BUSINESS, mechanic shop.

[9] Based on conversations with UC-1, I understood this to mean that LUCERO was stating he did not like to deal with firearms while he was dealing with methamphetamine and/or fentanyl pills.

[10] Based on conversations with the CS, I understood that LUCERO was offering the CS compensation for arranging the controlled purchases.

The DEA laboratory determined the drugs consisted of approximately 1,626 grams of pure methamphetamine and 269 grams of blue "M30" bills containing a detectable amount of fentanyl.

**D.**     **On December 2, 2024, LUCERO Sold approximately 1,773 Grams of Methamphetamine to a UC (Controlled Purchase #3)**

34.   Based on my review of text messages, recorded surveillance footage, and my conversations with the CS and other law enforcement officers, I am aware of the following:

35.   In November 2024, the CS texted the Subject Telephone inquiring about the purchase of methamphetamine and firearms.

36.   The CS and LUCERO agreed to meet on December 2, 2024. The CS informed LUCERO that he/she would not be present for the purchase, but that UC-1 would be.

37.   On December 2, 2024, an ATF surveillance team saw LUCERO walk out of the SUBJECT BUSINESS holding a white bag. They then saw LUCERO enter SUBJECT VEHICLE 1 before driving SUBJECT VEHICLE 1 towards the Meeting Location.

38.   Soon afterwards, LUCERO arrived at the Meeting Location, where UC-1 was waiting.

39.   LUCERO handed a white plastic grocery bag to UC-1. The plastic bag contained four clear sealed bags of suspected methamphetamine.

40.   When UC-1 inquired about firearms, LUCERO responded by saying that he would check for firearms by the end of the week. LUCERO also said he did not like sending pictures of firearms and would contact UC-1 directly if he happened to locate

available firearms.  UC-1 said he understood and paid $3,000 to LUCERO for the methamphetamine.

41.  LUCERO returned to SUBJECT VEHICLE 1 and departed the Meeting Location.  Soon afterwards, an ATF surveillance team saw LUCERO return to the SUBJECT BUSINESS.

42.  The suspected drugs were sent to a DEA laboratory for testing.  The DEA laboratory determined the drugs consisted of approximately 1,773 grams of pure methamphetamine.

**E.    On January 16, 2025, LUCERO sold approximately 1,704 Grams of Methamphetamine to a UC (Controlled Purchase #4)**

43.  Based on my review of text messages, recorded surveillance footage, and my conversations with UC-1 and other law enforcement officers, I am aware of the following:

44.  In January 2025, UC-1 texted the Subject Telephone and inquired about the purchase of methamphetamine and firearms.

45.  UC-1 and LUCERO agreed to meet on January 16, 2025.

46.  On January 16, 2025, an ATF surveillance team saw LUCERO walk out of the SUBJECT BUSINESS and enter SUBJECT VEHICLE 2 before driving SUBJECT VEHICLE 2 towards the Meeting Location.

47.  Soon afterwards, LUCERO arrived at the Meeting Location, where UC-1 and another ATF Undercover Agent ("UC-2") were waiting.

48.  LUCERO handed UC-1 a black box containing four clear sealed bags of suspected methamphetamine.

49.  UC-1 asked LUCERO about the firearms that they had

discussed previously.  LUCERO responded, "Actually I have one, and . . . pero . . . I was waiting on you to call me."  UC-1 asked if LUCERO currently had it on him (or readily accessible). LUCERO responded, "No conmigo (not with me)."  UC-1 then asked if LUCERO had a photograph of the firearm.  LUCERO indicated he did not.

50.  UC-1 handed $3,000 to LUCERO for the suspected methamphetamine.  While LUCERO was counting the money, UC-1 asked LUCERO if LUCERO could sell him/her the firearm before the end of the week.  LUCERO asked UC-1 if UC-1 needed a Glock, and UC-1 replied that his/her customer asked for a Glock but is open to purchasing any other type of firearm.

51.  LUCERO stated "I know for sure I have a 40."[11]  LUCERO further stated, "Let me tell him right now, he can send me a picture."

52.  LUCERO proceeded to call an unidentified contact on his cell phone.  While the phone was ringing, LUCERO mentioned that the individual was just at his "shop."[12]  The phone call appeared to go to voicemail.  LUCERO reiterated to UC-1, "I have em for sure, 100 percent, like no lie, I have em."

53.  LUCERO then entered SUBJECT VEHICLE 2 and drove away. Soon afterwards, an ATF surveillance team saw LUCERO arrive at the SUBJECT BUSINESS in SUBJECT VEHICLE 2.

---

[11] I understand "40" as referring to a .40 S&W caliber firearm or a Glock Model 40.

[12] I understand the "shop" as referring to the SUBJECT BUSINESS, mechanic shop.

54.   The suspected drugs were sent to a DEA laboratory for testing.  The DEA laboratory determined the drugs consisted of approximately 1,704 grams of pure methamphetamine.

55.   Later that afternoon, on January 16, 2025, LUCERO used the Subject Telephone to send UC-1 two pictures depicting a Glock-style pistol:

 

56.   UC-1 called the Subject Telephone and asked LUCERO if LUCERO's unidentified source would consider selling the pistol for $800.  LUCERO responded, stating "That's mine . . . that's mine."  UC-1 acknowledged and again asked if LUCERO would take $800 for the pistol.  LUCERO indicated that LUCERO "wanted a $1,000" but to "give me $900."  UC-1 agreed to the $900 price.  LUCERO stated, "You come pick it up right now and I'll tell him to drop it off."  UC-1 asked where he/she could pick up the pistol.  LUCERO stated, "I'm waiting for him to drop it off first . . . let me call him right now . . . he could drop it off to me," and asked UC-1 to give him five minutes.  UC-1 agreed and the phone conversation ended.

57.   LUCERO then texted UC-1, stating, "He is not home he said tomorroe (sic) if possible, or on your next time you come I'll try to having them all together."  UC-1 acknowledged.

**F.    On January 27, 2025, LUCERO Sold Three Firearms to a UC (Controlled Purchase #5)**

58.   Based on my review of text messages, recorded surveillance footage, and my conversations with UC-1 and other law enforcement officers, I am aware of the following:

59.   On January 17, 2025, LUCERO texted UC-1 via the Subject Telephone and asked, "You want only hand guns or don't matter?"  UC-1 responded, "It don't matter" and "What else you got?"

60.   LUCERO then texted UC-1 a picture depicting an AR-style rifle:



61.   UC-1 inquired about its price.  LUCERO replied, "Thats my boii he has it he can drop it off he wants $1,200" and "Ill try talking to him see if drop it down."

62.   UC-1 responded that he/she was willing to purchase the rifle for $1,200.  LUCERO stated he would tell his unidentified acquaintance.

63.   UC-1 and LUCERO initially agreed to meet on January 27, 2025 at the Meeting Location.  Later, UC-1 negotiated the price of the rifle from $1,200 down to $1,100 and the two agreed to meet at the SUBJECT BUSINESS instead.  UC-1 asked LUCERO to send him/her the address of the SUBJECT BUSINESS and LUCERO texted UC-1 "4408 s Kansas ave la ca."

64.   On January 27, 2025, UC-1 and UC-2 drove to the SUBJECT BUSINESS.  UC-1 called LUCERO and told him that he/she had arrived, and LUCERO responded, "Okay I came to do a car really quick, give me 13 minutes."  UC-1 acknowledged.

65.   Sometime later, UC-1 called LUCERO and asked LUCERO if LUCERO wanted him/her to come back later since LUCERO seemed to be busy.  LUCERO stated he was busy and asked if UC-1 wanted to

wait or if UC-1 was in a rush.  UC-1 asked if LUCERO currently possessed the firearms.  LUCERO responded, "Yea, I have it in there, I have it locked in there."  LUCERO then said that he did not expect the SUBJECT BUSINESS to be so busy and asked UC-1 to come back later in the day.

66.  UC-1 and UC-2 came back later the same day.  UC-1 called LUCERO and told him that they were in the alleyway behind the SUBJECT BUSINESS.  LUCERO acknowledged.

67.  Soon afterwards, an unidentified person waved towards the vehicle UC-1 and UC-2 were in.  LUCERO then exited the SUBJECT BUSINESS and also waved at the vehicle.

68.  UC-1 exited the vehicle and entered the garage of the SUBJECT BUSINESS.  The SUBJECT BUSINESS has two structures.  A south structure containing the garage, and an east structure. UC-1 entered the south structure containing the garage.

69.  He/she saw LUCERO holding a portion of an AR-type rifle in his hand.  He/she saw a second AR-type rifle in a box next to LUCERO.  LUCERO pointed at the pistol on a table and stated, "This is my Glock."

70.  UC-1 asked if the Glock pistol was "9," or $900. LUCERO confirmed.  UC-1 asked if LUCERO's gun source would be willing to sell the two rifles for $2,000.  LUCERO called his unidentified gun source and confirmed that the source would be willing to sell the two rifles for $2,000.  UC-1 inquired about other guns, and LUCERO responded, "I'll tell him right now, I'll tell him right now."  LUCERO then stated, "For sure, I have another Glock."

71.  UC-1 gave LUCERO $2,900, and UC-1 and LUCERO carried the three firearms to the vehicle UC-1 had arrived in.  LUCERO then agreed to keep UC-1 informed about the other Glock LUCERO had mentioned.

72.  After the transaction, I examined the purchased firearms and determined them to be as follows:

   a.  one Blood zone, AR-style, multi caliber rifle bearing serial number TB0100374 with an inserted magazine containing ten .223 caliber rounds;

   b.  one Bushmaster, model XM15-E2S, .223 caliber semi-automatic rifle, bearing serial number L077291, with an inserted magazine containing twenty-six .223 caliber rounds; and

   c.  one Glock-style, privately manufactured pistol, unknown caliber, bearing no serial number with an inserted magazine containing three assorted caliber rounds.

**G.  On March 7, 2025, LUCERO Sold One Firearm to a UC (Controlled Purchase #6)**

73.  Based on my review of text messages, recorded surveillance footage, and my conversations with UC-1 and other law enforcement officers, I am aware of the following:

74.  On March 4, 2025, LUCERO contacted UC-1 using the Subject Telephone and asked if UC-1 was only looking to buy "long ones," or rifles.

75.  UC-1 texted LUCERO and told him that he/she was not only looking to purchase rifles.

76.  LUCERO then texted UC-1 stating "My boii has these," along with two pictures depicting two different pistols:

 

77.   UC-1 asked about the price, and LUCERO texted back stating, "$900 on top one and the 2nd one he said 1000."  UC-1 eventually agreed on the proposed price of $1,900 for both.

78.   Later, LUCERO texted UC-1 stating, "I was only to get the short one."  UC-1 agreed to purchase the single pistol and agreed to purchase the other pistol later.

79.   UC-1 and LUCERO agreed to conduct the transaction on May 7, 2025 at the SUBJECT BUSINESS.

80.   Later, LUCERO texted UC-1 "I have a revolver" and asked "Are un interested."  UC-1 called LUCERO and asked LUCERO for the price of the revolver.  When LUCERO asked UC-1 to make an offer, UC-1 responded that he would have to inspect the revolver first.

81.   UC-1 and UC-2 drove to the SUBJECT BUSINESS.  The same unidentified person from the previous controlled purchase guided the vehicle UC-1 was driving into the **Subject Business**.  The unidentified person stated that LUCERO was not currently there but would return shortly.

82.  Sometime later, a white 2012 Honda Pilot arrived at the SUBJECT BUSINESS and parked behind the vehicle UC-1 arrived in.  LUCERO exited the driver seat of the Honda Pilot, and a Hispanic male later identified as Emilio LUCERO ("E. LUCERO") exited the front passenger seat of the Pilot.

83.  LUCERO invited UC-1 into the east structure of the SUBJECT BUSINESS.  UC-1 entered the east structure and saw that it looked like a living space, with a bed and a refrigerator. There, LUCERO introduced E. LUCERO to UC-1, stating that E. LUCERO was his father.  E. LUCERO introduced himself as "Tony."

84.  LUCERO handed UC-1 a pistol and UC-1 examined it.

85.  LUCERO then placed a revolver on the bed and stated, "This is the other one."  UC-1 examined the revolver, and E. LUCERO stated "we never used it" and "it still shoots."  E. LUCERO then showed UC-1 ammunition for the revolver.

86.  LUCERO then stated "I have another one, let me get more," and opened a blue Smith & Wesson pistol case lying on the other side of the case, revealing a pistol.  UC-1 asked if LUCERO was also selling the pistol in the case, and LUCERO said no, stating: "This one it's cause I don't want to sell it.  This is my, this is my dad's personal use."

87.  UC-1 told LUCERO he/she understood LUCERO was busy and asked LUCERO to introduce UC-1 to LUCERO's firearm sources. LUCERO, referring to the firearms, stated, "No they're mine, they're all mine."

88.  LUCERO, referring to methamphetamine, asked UC-1, "And the other things right now, you don't want nothing right now?"

UC-1 stated he was primarily interested in firearms. LUCERO asked UC-1, "You end up selling the other big ones," in reference to the two rifles UC-1 previously purchased from LUCERO. UC-1 said yes. UC-1 asked about purchasing more rifles since LUCERO had previously stated the source of those two rifles could get more. LUCERO responded, "That's what I told him but either way, I have, I have one of my boys uh, he could build them. Uh Imma try and get him a picture. He's, he was in the army, so he knows how to build them and all that stuff, so he could probably send, he could probably ship them to me in pieces." UC-1 asked where the source was. LUCERO asked E. LUCERO, who stated the person was in Pennsylvania.

89.   UC-1 gave LUCERO $900 for the pistol and agreed to pay $750 for the revolver. UC-1 told LUCERO that he would get more money from UC-2. UC-1 carried the pistol and revolver outside, gave UC-2 the suspected firearms, and received additional money from UC-2. UC-1 then handed LUCERO an additional $750.

90.   A further review of the purchased items revealed that the revolver was not a firearm, but a BB gun. UC-1 called LUCERO and told him that the revolver was not a real firearm. LUCERO responded that he did not know "brands" and offered to give UC-1 his/her money back. They eventually agreed that LUCERO would try to get UC-1 another firearm.

91.   I later examined the purchased pistol and BB gun and determined them to be as follows:

a.   one Heckler & Koch, model P2000, .40 caliber pistol bearing serial number 123-086624 with an inserted magazine containing four .40 caliber rounds.

b.   one Umarex, model UX-257, .177 caliber BB revolver bearing serial number 19E10579; and

c.   five pellet cartridges fitted to .177 caliber.

92.  On May 12, 2025, UC-1 texted the Subject Telephone and inquired about purchasing additional firearms.  LUCERO responded and sent the UC a video depicting approximately five pistols. Below are still images from the video:

 

93.  On May 27, 2027, LUCERO texted UC-1 via the Subject Telephone a picture showing four pistols for sale:



**H.    Phone Location Information**

94.   Beginning in December 2024 and continuing to the present, I obtained phone location information for the Subject Telephone subscribed to LUCERO pursuant to a federal search warrant and subsequent extensions of that warrant.  During this time period, and as recently as July 4, 2025, phone location information showed that the Subject Telephone was frequently at the SUBJECT BUSINESS.

**I.    Interstate Nexus**

95.   On February 7, 2025, an ATF Interstate Nexus Expert examined the following firearm and ammunition purchased from LUCERO on January 27, 2025, and confirmed that they were manufactured outside of the State of California:

        a.    one Bushmaster, model XM15-E2S, .223 caliber semi-automatic rifle, bearing serial number L077291;

        b.    thirty-six rounds of Giulio Fiocchi, Lecco (G.F.L.), .223 caliber ammunition, marked with the headstamp "GFL 223 REM";

c.    two rounds of Sellier & Bellot (S&B), 9x19 caliber ammunition, marked with the headstamp "S&B 9x19 22"; and

d.    one round of Geco .38 Super caliber ammunition, marked with the headstamp "Geco 38 SUPER AUTO."

96.   On May 27, 2025, the same ATF Interstate Nexus Expert examined the following firearm and ammunition purchased from LUCERO on March 7, 2025, and confirmed that they were manufactured outside of the State of California:

a.    one Heckler & Koch, model P2000, .40 caliber pistol bearing serial number 123-086624;

b.    four rounds of Giulio Fiocchi, Lecco (G.F.L.), .40 caliber ammunition, marked with the headstamp "GFL 40 S&W."

97.   Because the firearms and ammunition were found in California, the ATF Interstate Nexus Expert believes that they have traveled in and affected interstate commerce.

### V.   TRAINING AND EXPERIENCE ON DRUG OFFENSES

98.   Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.    Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.    Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices, and in their residences or businesses.

c.    Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.    Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residences or businesses. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residences or businesses, including in the form of calendar entries and location data.

e.    Drug traffickers often use vehicles to transport

their narcotics and may keep stashes of narcotics in their
vehicles in the event of an unexpected opportunity to sell
narcotics arises.

       f.   Drug traffickers often maintain on hand large
amounts of United States currency in order to maintain and
finance their ongoing drug trafficking businesses, which operate
on a cash basis.  Such currency is often stored in their
residences or businesses.

       g.   Drug traffickers often keep drugs in places where
they have ready access and control, such as at their residences
or businesses or in safes. They also often keep other items
related to their drug trafficking activities at their residences
or businesses, such as digital scales, packaging materials, and
proceeds of drug trafficking.  These items are often small
enough to be easily hidden and thus may be kept at a drug
trafficker's residence or homes frequently used by them even if
the drug trafficker lives with others who may be unaware of his
criminal activity.

       h.   It is common for drug traffickers to own multiple
phones of varying sophistication and cost as a method to
diversify communications between various customers and
suppliers.  These phones range from sophisticated smart phones
using digital communications applications such as Blackberry
Messenger, WhatsApp, and the like, to cheap, simple, and often
prepaid flip phones, known colloquially as "drop phones," for
actual voice communications.

## VI. <u>TRAINING AND EXPERIENCE ON FIREARMS OFFENSES</u>

99. From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct firearms investigations, I am aware of the following:

a.   Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residences or businesses, or in places that are readily accessible, and under their physical control, such in their digital devices.  It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals.  Such information is also kept on digital devices.

b.   Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices.  These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

c.   Those who illegally possess firearms often also sell their firearms and purchase firearms.  Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices.  This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price.  In my experience,

individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

> d.   Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

### VII.  <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>[13]

100. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

> a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained

---

[13] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

101. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

102. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.    Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

103. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress LUCERO's thumb- and/or fingers on the

device(s); and (2) hold the device(s) in front of LUCERO's face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

104. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VIII.    CONCLUSION

105. For all the reasons above, there is probable cause to believe that LUCERO has committed violations of 21 U.S.C. § 841(a)(1) (Distribution of a Controlled Substance) and 18 U.S.C § 922(a)(1)(A) (Engaging in the Business of Dealing in Firearms Without a License).  There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT BUSINESS described in Attachment A-1, SUBJECT VEHICLE 1 as described in Attachment A-2, SUBJECT VEHICLE 2 as described in Attachment A-3, and the person of LUCERO described in Attachment A-4.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this  14th day of July
June, 2025.

_____
HONORABLE PATRICIA DONAHUE
UNITED STATES MAGISTRATE JUDGE